**Affirmed and Memorandum Opinion filed March 17, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00681-CV

## IN THE INTEREST OF J.M.R.C. AND J.M.A.C., CHILDREN

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2016-00958J**

## MEMORANDUM OPINION

K.A.D. ("Mother") appeals the trial court's final order terminating her parental rights to minor children J.M.R.C. ("Jan") and J.M.A.C. ("Jill").[1] The trial court terminated Mother's parental rights on predicate grounds of endangerment and failure to comply with the court-ordered service plan for reunification. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O). The trial court further found that the termination of parental rights was in the children's best interest. *See id*. §

---

[1] We use pseudonyms in this opinion to refer to appellant and the minor children. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

161.001(b)(2). In four issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's two predicate findings for termination and its best interest determination and also contends the trial court abused its discretion in appointing the Department of Family and Protective Services (the "Department") as the children's sole managing conservator. We affirm.

## *Background*

Trial was held on August 3 and 8 of 2022. At that time, Jan was nine years old, Jill was seven years old, Mother was 28, and the children's father was deceased. Also, by then, Mother had not had legal custody of the children for approximately seven years. At trial, the Department opposed termination. The attorney ad litem for the children, however, had also filed pleadings seeking termination in the case and, along with the children's guardian ad litem, urged the court to terminate Mother's rights.[2]

Suit was originally filed in this case by the Department in early 2016. In the first removal affidavit, which was admitted at trial without objection, a Department representative averred that in August 2015, a referral came into the Department in Dallas regarding the children based on concerns of sexual abuse of Jan after the parents had allowed friends to babysit her. At that time, both parents tested positive for amphetamines and methamphetamines. The Dallas case was ruled "Unable to Complete" because the family could not be located. The family was subsequently discovered in Houston, and the Department opened a case in Harris County "with Reason to Believe for Neglectful Supervision." The children were then placed with their maternal grandmother. Around this time, the children's father was killed in an

---

[2] *See generally* Tex. Fam. Code §§ 102.003(a)(2), 107.008; *In re J.A.*, 109 S.W.3d 869, 873 (Tex. App.—Dallas 2003, pet. denied). In this appeal, Mother and the attorney ad litem have filed briefs, but the Department declined to file a brief despite our request that it do so.

accident and Mother was arrested for theft, although she stated it was a misunderstanding. The affidavit lists two convictions for theft, for which Mother served sentences of 10 days and 12 days. Grandmother subsequently stated she was no longer willing to care for the children because of problems she was having with Mother, including the stealing of items from grandmother's home. It was also noted that Mother did not have stable employment or housing. In February 2017, the trial court entered a judgment naming Mother as possessory conservator of the children, and then in May of that year, the court signed a nunc pro tunc judgment naming a paternal aunt as sole managing conservator of the children.

In August 2021, the Department filed a motion to modify. A second removal affidavit was filed and also admitted at trial without objection. In this affidavit, a Department representative stated that the Department had received a referral after "a bystander saw the two children walking with backpacks, a puppy[,] and blankets on a road" and called the police. The children explained that they had left a house where people had hurt them, and one of the children had a bruise on her face. The affiant further averred that paternal aunt admitted hitting the children with a belt out of anger, and the children had "several marks on their back[s] and extremities as well as their face[s]." The children described repeated physical abuse by the aunt and her wife and said that they did not want to live at that house anymore. Subsequent examination at a hospital indicated the abuse had continued "for many years." Under criminal history for Mother, the affidavit listed four theft charges and one aggravated robbery charge occurring between 2015 and 2019. The children were removed from paternal aunt's home and placed in a foster home.

Department caseworker Keyana Lewis testified that Jan and Jill were doing well and thriving in the foster home, and their visitations with Mother were also going well. On those visits, which occurred two or three times a month, Mother

3

was attentive to the children and their needs, and Lewis described Mother and the children as having "a very loving and caring bond." In the previous nine months, Mother had not missed any visits except when she was incarcerated. According to Lewis, neither the attorney ad litem nor the guardian ad litem had witnessed any of the visitations.

Lewis said the children had consistently stated a desire to live with Mother, and they were always sad when she left. Lewis listed a number of services and requirements that Mother had completed on her Family Service Plan, including individual counseling, a psychosocial assessment, parenting classes, and a substance abuse assessment. Lewis also asserted Mother completed all recommendations made by every assessment and had taken the initiative to attend psychiatric services on her own. Mother has also maintained consistent contact with Lewis, providing updates and asking if there is anything she needs to do. Lewis mentioned that although Mother tested positive for cocaine in October 2021 and May 2022, she tested negative in January and July 2022. According to Lewis, Mother has only missed one family service meeting and one court hearing.

Lewis said that she verified employment information for Mother and Mother at one point had her own apartment but was now living with Mr. and Ms. Figueroa and their twelve-year-old son. Mother also has a one-year-old child who is living with her. The Figueroas are "very open" to having Mother and the children live with them, and there has been discussion regarding the Figueroas acting as conservators of the children or even adopting them. Lewis has visited the home five or six times and has no concerns regarding safety in the home. Mr. Figueroa apparently grew up with Jan and Jill's father. Lewis noted that Mr. Figueroa has criminal history from over ten years prior (possession of a controlled substance and criminal mischief), but the couple does not have any history with the Department.

At the time of trial, Mr. Figueroa was unemployed. She said that the Figueroas have "known the children since pretty much birth."

Lewis explained that the Department's goal in the case had previously been family reunification with Mother as the primary goal with unrelated adoption as an alternative but it had changed two weeks before trial "to relative fictive kin conservatorship and then family reunification with Mother as the concurrent." The Department recommended that the Figueroas have a joint conservatorship over the children with Mother and that Ms. Figueroa have the right to designate the children's primary residence and make educational decisions. Lewis opined that this was in the children's best interest because the Figueroas "have shown themselves to be a very great help" to Mother and the children.

According to Lewis, at the time of trial, Mother was living with the Figueroas but was willing to move out if the court thought that was best for the children. Reportedly, Mother had to move from her prior residence because it was sold by the owner. Mother was employed at Car Spa and had been working full time for over a year, driving and cleaning cars.

Lewis further reported that Mother had been incarcerated for two to three weeks in March or April 2022 for alleged assaults against family members (two of her sisters) and those cases were still pending. Mother was also on probation in the federal system. Mother appears remorseful for things in the past related to the children, and Lewis has "seen a lot of growth" in her. Lewis believes "Mother has shown the ability to appropriately parent these children," and Lewis believes the Figueroas would do so as well. Lewis acknowledged, however, that aside from the Figueroas, Mother did not have a support system in her life and did not have contact with her family.

Lewis asserted that the foster mother was willing to adopt the children but

5

has reservations because she knew it "probably would break their little hearts if they aren't allowed to go home to be with Mother" and she did not want to be rushed into it. According to Lewis, foster mother also knew there might be behavioral and emotional issues if the children were not reunited with Mother. Lewis expressed concern regarding the permanency of the children's current placement. She acknowledged that Mother and foster mother worked well together, but Lewis had not spoken to foster mother regarding whether she would allow Mother to maintain contact if foster mother adopted the girls. Lewis also noted that there was an outcry from the children regarding sexual abuse while in the care of the paternal aunt.

On cross-examination by the attorney ad litem, Lewis acknowledged that in regard to the original referral in 2015, Mother admitted she had allowed people she did not know well to babysit Jan. Lewis further acknowledged that the Department sought temporary conservatorship in 2016 due to Mother's drug use, criminal activity, unemployment, and unstable housing. Mother then tested positive on three occasions for cocaine, marijuana, and "benzos." A report to the court in 2017 also mentioned Mother had tested positive for "Meth, coke, Ecstasy, marijuana, [and] oxycodone." Lewis stated it was her understanding that Mother did not have continuous contact with the children while they were in the aunt's care because the aunt was blocking her access to the children. Lewis agreed that Mother's positive drug test in May illustrated noncompliance with the Family Service Plan, and she agreed that Mother had an extensive criminal history and had been incarcerated during the pendency of the case.

Regarding the foster home, Lewis additionally testified that foster mother is a teacher, the children have rooms in the home, and to Lewis's knowledge, there is no one in the home with a criminal history, pending felony charges, drug history,

6

or history with the Department. She also agreed that the home is safe and stable, the children are thriving there, and all their needs are being met.

Jhillian Tillis is the Department supervisor over the case. She testified that the Department sought placement with the Figueroas because the Mother and the children know them. The Department also sought supervised visitation for Mother. She stated that Mother had engaged in her services, was very active in therapy, and had taken responsibility for what happened in the past.

Mother testified that she has lived with the Figueroas for about a month and has known Mr. Figueroa since she was 17, having met him through the children's father. She moved in with the Figueroas because her prior lease was terminated due a pending sale of the property. Her preference is that the children be allowed to live with her, but she is okay with the Figueroas having conservatorship if that is what the court orders. She said that she would assist meeting the children's needs "[i]n any way possible," including financial, rides, and clothes. Mother acknowledged that she has made some mistakes but asserted she has changed and grown and learned a lot from her services, and her mindset is a lot different now. She said that she is a good mom and her children tell her so. She works full time at Car Spa and has been there over two years.

Mother explained that she first started experimenting with drugs, including cocaine and ecstasy, when she was 20 years old. She asserted she was sexually assaulted by stepfathers and moved out of her mother's home when she was 14 and lived with a family friend. She does not have a good relationship with her mother and has never known her father. She said that she took it hard when the children's father died in a jet ski accident and she used drugs as a coping mechanism. She said that the last time she got high was in 2021, and she indicated the 2022 positive drug test was inaccurate. She insisted she does not want to get high anymore.

Mother maintained that she was unaware of the environment in the paternal aunt's home because she rarely saw her children during that time, maybe once every three months. She wishes she had paid more attention and been more engaged.

Regarding her criminal activity, Mother acknowledged she had pleaded guilty to theft of a motor vehicle and received deferred adjudication, but she asserted it involved a friend's vehicle and was just a misunderstanding and that she had completed everything required except the payment of certain fees. She also admitted she was facing a federal charge for aiding and abetting a robbery but said she had not been to court on that charge yet because of the pandemic. She explained that she took a friend to a store and then back home but was unaware he had robbed the place. She admitted, however, that she knew the friend was armed when they went to the store. She also acknowledged being convicted of misdemeanors. Regarding the pending aggravated assault charges against family members, Mother said that the incident was really between her sisters and the father of her youngest child and her sisters had added allegations against her.

On cross-examination, Mother admitted that after being given a Family Service Plan in 2016 for reunification with her children, she tested positive for cocaine "[a] few times throughout the case." Regarding why she had agreed to have her mother take custody of the children in 2015 when she had previously been sexually assaulted by her stepfathers, Mother stated, "My mother didn't rape me. I mean, the stepfather raped me." Regarding the deferred adjudication Mother received for theft of a motor vehicle, she acknowledged that the state had filed a motion to adjudicate in 2019 due to her having tested positive for illegal drug use and she was currently out on bond. The aggravated robbery charge carried a potential sentence range of up to 20 years. Mother acknowledged at the time of

8

trial that she had four pending criminal cases against her: the two aggravated assaults on family members, the aggravated robbery, and the motion to adjudicate for the theft of a motor vehicle.

In relation to the aggravated robbery charge, a federal Order of Detention Pending Trial was admitted in which a federal magistrate noted that it was alleged Mother participated in two store robberies by both acting as a driver and casing the stores to look for security and that Mother's co-defendants had admitted to leaving her car with their guns drawn. The magistrate further noted that the offense allegedly occurred while Mother was on felony probation for another offense. Mother, however, denied that she was involved in two separate robberies. Mother said that she spent a few months in a federal jail, but she was unable to say whether it had been 14 or 17 months, stating only, "I was there for a while." Mother believes her sentencing exposure in the robbery case is up to 52 months but that she is eligible for probation. On September 3, 2021, Mother was arrested for shoplifting, but she explained that it was a misunderstanding and the case was dismissed.

Regarding her housing immediately before moving in with the Figueroas, Mother acknowledged it was public housing and that she did not have any documentation showing the property was sold. She further agreed that residents of government housing projects must undergo criminal background checks every year to establish compliance with the lease, and it was reasonable to assume they would have discovered her four pending felony charges. She said that she was told the property was being sold, but she does not know if that is accurate. She agreed that her children could have avoided being beaten and sexually assaulted if she had gotten a job, a home, and stayed out of jail and off drugs. She again acknowledged she tested positive for drugs in October 2021 and May 2022.

9

Ms. Figueroa testified that she rents a three-bedroom house where currently she, her husband, their twelve-year-old son, Mother, and Mother's youngest child live. She and her husband have been married since April 2022, and she has worked as a driver for a dental lab since January or February. Mr. Figueroa stopped working because he had developed a blood clot. She said that she has known Mother for as long as she has known her husband, which is around seven to eight years. She said that she met Jan and Jill eight to twelve times when they were small, and all of the visits with Mother have occurred in the Figueroa household since Mother moved in with them. Ms. Figueroa has observed these visits and describes them as going very well. She also asserted that the girls get along well with her son and he is sad whenever they leave. Ms. Figueroa's mother lives next door and is a big help to the family. Although she acknowledged the girls probably do not know the Figueroas' real names, Ms. Figueroa believes they have established a relationship. Jan and Jill refer to Mr. Figueroa as "Uncle Pugs" and are very close to him. The girls are sad when they have to leave, and Ms. Figueroa has no doubt that they love Mother. She and her husband are willing to accept custody of Jan and Jill. She is absolutely willing to have the girls continue therapy, and she wants to see them "better themselves and be in a better place." Ms. Figueroa admitted having concerns regarding Mother's criminal history and drug use.

Mr. Figueroa testified that he has known Jan and Jill "since they were babies" and knew their father since he was 13. "He's like my little brother." Mr. Figueroa explained that he was ready to start working again and was looking for a job. He considers himself family to Jan and Jill and said that they should be with family. He admitted receiving deferred adjudication for possession of cocaine when he was a teenager and also having a conviction for criminal mischief. He also

described an incident in which he killed two men that were attempting to rob a bar, but no charges were filed against him because of the incident. Mr. Figueroa said that he loves the girls and knows that he could take care of them because he has a strong support system. He said that if Mother's rights were ultimately terminated, he would adopt the girls "in a heartbeat."

A drug testing expert testified that Mother had tested positive for cocaine use in March and November 2016, again in 2021, and in May 2022. She also tested negative twice in 2016. The expert opined that there was "no doubt" Mother used cocaine during the pendency of the case and the positive tests could not have been caused by the use of other medication. He explained that the amounts detected suggested "a small amount of usage" but noted the established usage was over a six-year period.

A therapist testified that she had been seeing Mother for about five months, or a total of eight visits, at the time of trial. She asserted that Mother had shown improvement and had been prescribed medicine to help with her ADHD. The therapist was also working with Mother on her anxiety, PTSD, and parenting skills.

The children's guardian ad litem, Gadeer Subuh, testified that she is the advocacy coordinator for Child Advocates. Among other work on the case, she had reviewed the case file and met with the children in their foster home. Subuh recommended termination of Mother's parental rights based on Mother's "ongoing criminal conduct since 2015," the pending felony charges, ongoing substance abuse, instability of housing, and the basic ongoing pattern of Mother's conduct. Subuh expressed concern that Mother was again living with friends and without a place of her own. She agreed that the "children have endured horrific abuse and neglect continually since 2015." Subuh asserted the Department had not been cooperative in the case, failing to respond to inquiries and withholding information

11

from her. Subuh opined that Mother's continuing drug use and criminal conduct both endangered the children and demonstrated she did not comply with the Family Service Plan. Additionally, Mother's failure to maintain stable housing also violated the Plan. Based on a Harris County Appraisal District document admitted into evidence, Subuh noted that the property where Mother previously had an apartment was owned and had been owned by the City of Houston Housing Authority since 1999. Subuh explained that when she investigated Mother's housing situation, she discovered that Mother had failed to pass her criminal recertification for staying in the apartment.

Subuh said that the first time she heard about the Figueroas as a possible placement was a month before trial. She suggested it was unlikely the Figueroas had developed much of a relationship with Jan and Jill. In talking to the children, it did not seem as though they were aware of the Figueroas. Subuh did a virtual visit to the Figueroas' home, and it looked clean and appropriate. She also verified Ms. Figueroa's employment. Regarding foster mother, Subuh stated that she is meeting the children's needs and doing a good job of educating them, and they are thriving in her home. Foster mother has the children attending therapy to address their PTSD, and she has unambiguously stated a desire to adopt the children.

Subuh acknowledged the children had expressed a desire to live with their Mother, and she believes they love their Mother, but Subuh opined that it would benefit the children in the long term to end their relationship with Mother. According to Subuh, Jan seemed stressed due to the unpredictability in her life and "in her mind she was hoping that her mother would get it together, stay out of jail, things of that nature." Jan had made "outcries" of inappropriate touching against both Mother and the aunt. Subuh additionally reiterated that the children had suffered severe abuse and neglect since 2015 to the present time and that Mother

12

had "a clear pattern of substance use and criminal conduct." Subuh again accused the Department of withholding information and of failing to protect the children. Subuh admitted that she had never observed a visit between Mother and the girls, but she explained that she had made more than five requests with the caseworker to be allowed to do so but the caseworker generally would not provide any information about the visits except for one time on the eve of the visit day.[3]

In answering a question by the court, Subuh explained the relevance of Mother's cocaine use as stemming from the fact it showed her behavior had not changed and it also impacted her decision-making, ability to meet the children's needs, and to be timely. Regarding Mother's criminal conduct, Subuh stated that it put the children in dangerous situations, especially given the fact some of the alleged crimes involved firearms.

Foster mother testified that when the children first entered her home, they had behavioral issues, but she said that they were doing 85 percent better. She said that Jan had detailed a long history of abuse and neglect by the aunt as well as by Mother. Just two weeks before trial, Jan told foster mother and the attorney ad litem that Mother had touched her inappropriately. Foster mother revealed that Jan was hoping she could live with Mother, Jill, and her baby sister, but Jan seemed apprehensive about living in someone else's house. She did not appear to know the Figueroas by name. Jan asked a lot of questions about Mother's future and whether Mother was going to jail and about why she had been placed in the Department's care and why anyone would have placed her with her aunt.

Foster mother insisted that she was willing to adopt Jan and Jill "without

---

[3] It is worth noting at this juncture that the second removal affidavit admitted into evidence mentioned that caseworker Lewis had been seeing the children frequently for years while they were in the care of the paternal aunt and had not reported seeing any marks on the children from the physical abuse they were found to have suffered.

reservation." Foster mother testified that she is a teacher and has been in education for 21 years, owns her own home, and does not have a criminal record, a record with the Department, or drug abuse issues. Foster mother explained that as a result of her profession, she had been able to get the children "up to speed" on their education. They love to learn. She has also been helping them with their PTSD. She said that she has developed a bond with the girls and she loves them. If she keeps the children, she would like to enroll them in dance class and perhaps "place them in [the] School of Performing Arts, since they both are heavily into art and drama and entertainment." She said that she would absolutely send them to college if they wanted to go.

Foster mother said that the girls have always believed that they are going to live with their Mother because Mother and the caseworker have been telling them they are doing everything they can to make it happen. She said that the girls love their Mother and enjoy their visits with her. When asked if it was important for the children to have Mother in their lives, foster mother indicated the answer was yes, if Mother was stable and added value to the girls' lives, but the answer was probably no, if she engaged in damaging behavior that endangered the children emotionally. Foster mother, however, did not believe it was her place to say whether Mother was currently adding value to the girls' lives. She said that neither Jan nor Jill remembers ever living with Mother. They enjoyed visitations with her because she was funny and brought them snacks and things and braided their hair, but the visits were usually only an hour or two long. She noted that the children were "on medication for PTSD and anxiety and borderline depression."

At the conclusion of the trial, the trial court ordered Mother's parental rights terminated and named the Department as sole managing conservator. In its decree, the trial court stated that Mother had engaged in conduct or knowingly placed the

children with persons who engaged in conduct which endangered the physical or emotional well-being of the children and had failed to comply with the provisions of the court-ordered Family Service Plan and that termination was in the best interest of the children.

### *Standards of Review*

As mentioned, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's order terminating their parental rights pursuant to Texas Family Code section 161.001(b). Because of the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

In reviewing a legal sufficiency challenge under the clear and convincing evidentiary standard, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all contrary evidence that a reasonable factfinder could have disbelieved. *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In reviewing termination findings for factual sufficiency, we consider and weigh all the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so

15

significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and do not substitute our judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). As always, the trier of fact is the sole judge of witness credibility. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re T.L.E.*, 579 S.W.3d 616, 626 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

### *Endangerment*

Mother first challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment finding under Family Code subsection 161.001(b)(1)(E). Under this provision, courts are authorized to terminate parental rights if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that conduct was specifically directed at the child or that the child actually suffered injury. *Id*.

Under subsection E, the relevant inquiry is whether the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission because the statute requires the parent engage in a voluntary, deliberate, and conscious course of conduct. *Id*. "As a general rule, subjecting children to a life of uncertainty and

16

instability endangers the children's physical and emotional well-being." *In re J.O.A.*, 283 S.W.3d at 345. In this analysis, courts may consider conduct occurring both before and after the Department removed the children from the home. *In re S.R.*, 452 S.W.3d at 360.

Mother provides little in the way of substantive analysis under her first issue, arguing generally that she was a "nonoffending parent" and was not responsible for the children coming into the Department's care and noting that her criminal and substance abuse history was not so concerning as to compel the Department to urge termination. As discussed above, however, the children originally came into the Department's care in 2015 because the parents had allowed someone they barely knew to babysit Jan and evidence strongly indicated that Jan was then sexually abused by that person. Subsequently, the parents tested positive for amphetamines and methamphetamines, and the Department determined that there was "Reason to Believe for Neglectful Supervision." Additionally, during the time that Jan and Jill have been in the Department's care, Mother has repeatedly tested positive for illegal drug use, including for cocaine twice in 2016, and again in 2021 and May 2022, just a few months before trial. A parent's drug use and its effect on her parenting may qualify as an endangering course of conduct. *See, e.g.*, *In re J.O.A.*, 283 S.W.3d at 345-46.

Moreover, Mother has a significant criminal history, including past misdemeanors and four pending felony charges at the time of trial. Mother's own mother, who was the original placement for the children, was reportedly no longer willing to keep the children due in part to Mother's stealing from her home. Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, and routinely subjecting children to the probability that they will be left without their parent endangers children's physical

17

and emotional well-being. *See, e.g.*, *In re A.A.C.*, No. 14-19-00560-CV, 2019 WL 6913327, at *6 (Tex. App.—Houston [14th Dist.] Dec. 19, 2019, no pet.) (mem. op.). Also, there were significant concerns raised regarding the stability of Mother's housing situation, including the fact she had apparently recently been removed from government housing due to her criminal conduct. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (considering lack of stable housing under subsection E).

The evidence detailed above was legally and factually sufficient to support termination under subsection E based on Mother's allegedly engaging in conduct which endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code § 161.001(b)(1)(E). Accordingly, we overrule Mother's first two issues challenging the sufficiency of the evidence to support the trial court's predicate findings for termination under section 161.001(b)(1).[4]

### *Best Interest*

We now turn to Mother's third issue challenging the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). The party requesting termination bears the heavy burden of rebutting that presumption. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). No specific set of facts is

---

[4] Having determined the evidence was sufficient to support the predicate finding for termination under subsection E, we need not consider the parties' arguments pertaining to subsection O. *See In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) ("Only one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'") (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)).

required to establish that termination is in the best interest of a child, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 572 S.W.3d 823, 837 (Tex. App.—Houston [14th Dist.] 2019, no pet.). These factors include: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating a parent's willingness and ability to provide the child with a safe environment). The same evidence used to establish grounds for termination under section 161.001(b)(1) may be probative in determining the best interest of the children. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

**The children's desires.** It was undisputed at trial that Mother loves the children and the children love Mother. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (explaining that a child's love for a parent is an important but not controlling best interest factor). It was also established that both Jan and Jill had stated a preference to be reunited with Mother. It should be noted, however, that foster mother remarked that Jan appeared anxious regarding living in another family's house, which would include the

19

proposed placement with the Figueroas.

**Emotional and physical needs and danger.** There was evidence that the children enjoyed their visits with Mother, were bonded with her, and were sad when they had to leave her. There was also evidence, however, that the children—age nine and seven at the time of trial—did not remember ever living with Mother and rarely saw her during the several years they lived with paternal aunt. The children reportedly have also bonded with foster mom, with whom they have lived for the better part of a year.

There was somewhat inconsistent evidence regarding how well the children know the Figueroas, with whom Mother and the Department wanted the children to live, at least until Mother could regain custody. There was evidence indicating the Figueroas would not have seen the children much after they were removed from Mother's care but recent visitations for Mother and the children have occurred at the Figueroas' home.

A parent's ability to provide a child with a safe environment is also a primary consideration in determining the child's best interest. *L.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 14-21-00552-CV, 2022 WL 906020, at *3 (Tex. App.—Houston [14th Dist.] Mar. 29, 2022, no pet.) (mem. op.). On this subject, as discussed above, there was evidence that Mother had well-established patterns of drug abuse and criminal conduct, had been incarcerated for months, and potentially faced significant future prison terms for four outstanding felony charges. *See, e.g.*, *In re E.R.W.*, 528 S.W.3d at 266 ("Mother's history of drug abuse bespeaks a course of conduct that the fact finder reasonably could conclude endangers [child]'s well-being."); *In re J.D.*, 436 S.W.3d at 119 (recognizing a parent's criminal history and incarceration, though not dispositive, may be considered in determining the best interest of a child). There was also an allegation that the older

20

child, Jan, had made an outcry of inappropriate touching against Mother. And the trial court could have considered the fact that Mother had been unable to regain custody of the children in seven years.

**Parenting abilities.** Owing largely to the fact that Mother has not had custody of Jan or Jill for around seven years, there was little information regarding her current parenting abilities. She reportedly interacted appropriately during visitation with the children and met their needs during those one-to-two-hour periods. There was virtually no evidence submitted regarding Mother's care of her one-year-old child, although it is noteworthy that she recently lost her government subsidized housing due to alleged criminal activity. There was also evidence that Jan and Jill were removed from Mother's care in part because she had allowed someone she barely knew to babysit Jan, who was then sexually assaulted by that person. Subsequently, Mother tested positive for amphetamines and methamphetamines, and the Department determined that there was "Reason to Believe for Neglectful Supervision." *See In re C.H.*, 89 S.W.3d 17, 27–8 (Tex. 2002) (explaining that historical deficiencies in parenting are relevant to the inquiry).

As for foster mother's abilities, evidence indicated that the children had shown 85 percent improvement in her care, she had gotten them "up to speed" on their education, and the children were "thriving" in her care. Also of note, foster mother is a teacher who has been in education for 21 years. There was no evidence presented, however, regarding any other children for whom foster mother may have provided care. It is also worth remembering that although adoption by foster mother may eventually occur, it was not an issue determined in this case. There was not a lot of evidence regarding the Figueroas' parenting abilities, although they do have a twelve-year-old son and apparently do not have a history with the

21

Department.

**Programs available to assist.** There is not a lot of evidence in the record regarding programs that are available to assist those seeking custody of the children. It is clear, however, that Mother had been actively engaged in services offered to her, at least in the recent past. Meanwhile, Foster mother has taken the children to therapy.

**Plans for the children.** Mother's plans for the children included having them live with her and the Figueroas—or just the Figueroas if that was what the court ordered. She expects for them to attend local schools. She would eventually like the children to live with her in their own home. Ms. Figueroa stated that she was willing to have the girls continue therapy and she wants to see them "better themselves and be in a better place."

Foster mother stated that if the girls stay with her, she would continue the girls' therapy and would like to enroll them in dance class and perhaps "place them in [the] School of Performing Arts, since they both are heavily into art and drama and entertainment." She said that she "absolutely" would send them to college if they wanted to go and would make arrangements for that.

**Stability.** The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *In re A.G.*, No. 14-18-01089-CV, 2019 WL 2385723, at *5 (Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied). As discussed in detail, Mother's life is marked by instability and future uncertainty. She has a history of drug use and criminal conduct that has continued through the years; she has spent months in jail and been incarcerated on multiple occasions; and at the time of trial, she had four felony charges pending with potential unknown prison sentences. She is also currently living with friends, having been evicted from

22

government housing. She acknowledged that apart from the Figueroas, she does not really have a support system. Mother did testify that she has been working full time for over a year.

The Figueroas have shown more stability than Mother, renting a house and being married for several months. Ms. Figueroa is employed, and Mr. Figueroa was looking for work, after having been unemployed for a time due to a medical condition. Mr. Figueroa has a criminal record but from many years ago.

Foster mother owns her own home and has been employed in education for 21 years. She does not have a criminal record, a record with the Department, or drug abuse issues.

**Acts and omissions of the parent and any excuses.** Mother's relevant acts and omissions have largely already been discussed, including the drug use, criminal conduct, admitted failure to remain involved with the children when they were with the paternal aunt, and the conduct that resulted in the children originally being taken into Departmental custody. Although Mother discussed her own difficult background that included leaving home at 14, not knowing her father or being on good terms with her own mother, being sexually assaulted as a child, and the fact that Jan and Jill's father died in an accident, it was unclear if these were offered as excuses for Mother's conduct. Regardless, the trial court certainly could have viewed them as factors explaining the difficulties Mother has faced as a parent.

**Conclusion.** On this record, a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344. Although it is clear from the record that Mother loves the children, it would also have been reasonable for the trial court to conclude that Mother lacks the ability to provide a safe and stable environment and

23

successfully parent the children. This is supported by the fact that Mother has not been able to obtain custody of the children in approximately seven years, she failed to remain consistently engaged with the children while they were in the abusive care of paternal aunt, and she has been unable to stay off drugs and out of criminal trouble even those these were obstacles to reunification with Jan and Jill. Moreover, the court could have assigned considerable weight to the four felony charges and potential resulting sentences that Mother was facing at the time of trial. Additionally, the evidence strongly indicates that the children are thriving and have greatly improved in foster mother's care, and adoption by foster mother appears to be a logical next step for the children. We overrule Mother's third issue challenging the sufficiency of the evidence to support the trial court's best interest finding under Family Code section 161.001(b)(2).

### *Appointment of Department as Conservator*

Lastly, Mother contends the trial court abused its discretion when it appointed the Department as the children's sole managing conservator. We have previously held that when evidence is sufficient to support parental termination, a trial court does not abuse its discretion in appointing the Department as the child's sole managing conservator. *See C.M.M. v. Dep't of Fam. & Protective Servs.*, No. 14-21-00702-CV, 2022 WL 1789925, at *16 (Tex. App.—Houston [14th Dist.] June 2, 2022, pet. denied) (mem. op.); *In re T.N.R.*, No. 14-21-00473-CV, 2022 WL 370035, at *7 (Tex. App.—Houston [14th Dist.] Feb. 8, 2022, no pet.) (mem. op.). Because the trial court terminated Mother's rights to the children and we affirm that decision, we cannot say that the trial court abused its discretion in appointing the Department as the children's sole managing conservator. Accordingly, we overrule Mother's final issue.

### *Conclusion*

24

We affirm the trial court's judgment terminating the parental rights of Mother to J.M.R.C. and J.M.A.C. and appointing the Department as sole managing conservator.


/s/    Frances Bourliot
       Justice


Panel consists of Justices Bourliot, Hassan, and Poissant.